## BATTLE *v.* THE STATE.

1. The verdict is not contrary to the law, and is supported by the evidence.
2. The court having distinctly instructed the jury that it was incumbent upon the State to overcome by satisfactory evidence the presumption of innocence which the law raises in favor of accused, and to establish "his guilt upon each material allegation contained in the indictment, and be-

yond all reasonable doubt," there was no error in failing to define "reasonable doubt" in connection with the charge that the jury must be satisfied to a reasonable and moral certainty of the guilt of the accused.

3. When in a trial for murder the jury are fully instructed upon the law of reasonable fears, it will not be cause for a new trial that the judge, in reading to the jury section 73 of the Penal Code, fails to add after the phrase, "the killing of the other was absolutely necessary," the words, "or that the party killing believed in good faith it was necessary."

4. There was no error in refusing to give in charge the written request submitted, there being no evidence to warrant so much thereof as related to the principle of law which makes the commission of a felony upon property a justification for homicide; and it not being good law, as claimed in another portion of the request, that a homicide can be justified if committed merely to prevent a serious personal injury not amounting to a felony upon the person killing.

Argued November 15, — Decided November 26, 1897.

Indictment for murder.    Before Judge Hart.    Laurens superior court.    July term, 1897.

Joe Battle was indicted for murder by stabbing Jordan Smith. The jury found him guilty of voluntary manslaughter; and his motion for a new trial having been overruled, he excepted. The testimony is conflicting and contradictory; but it appears that Battle was a tenant of Smith for the year 1895, and was to pay rent in baled cotton.    On October 1st of that year, a wagon having been loaded with cotton, they disputed as to where it should be ginned, Smith desiring to have it ginned at Hobbs's gin, and Battle desiring to carry the cotton to Bryant's gin, four miles away, where he claimed that it would be ginned for fifty cents less.    The wagon was driven by Smith to Hobbs's gin, and Battle followed.    Gibson testified that Smith got down from the wagon and went part of the way towards the platform, then turned and went back and met Battle at the gate, where the two fought with their fists, and when Battle got against the gate he stooped and got from under Smith and walked out at the gate, and Smith started back to the wagon; that while Smith was going to the wagon they said something to one another, and Battle turned and raised his hand with his knife in it, and Smith seized a piece of a rail; that when they met, Smith knocked Battle with the rail, and witness saw the knife come over and heard the lick struck and saw Smith's head hit the ground, whereupon Fullwood went and pulled

them apart; that Battle said he had been run over all the year and was not going to take it any more, and walked off, while Smith said, "God, I will kill you," walked a few steps, lay down and died. When witness first saw them together, he saw Battle dodge under Smith, go out the gate, draw his knife and start towards Smith; and then Smith picked up the rail and started towards Battle. He knocked Battle against the gate-post and Battle dodged under him. Then Smith hit the first blow. He fell first, fell backwards with his face up. He might have turned Battle in the struggle. Witness saw Smith strike only one lick with the rail, which was as large as a man's arm, but did not think a man could kill another with it. King testified, that Smith had been at the gin-house some time before Battle came, and it seemed as if he started across to Battle to. stop him from coming in at the gate, and Battle struck at him. They tussled about there a little bit, and Battle went out the gate, turned and came back, and Smith picked up a piece of rail and struck at Battle. Smith had gone back to the gate when Battle started back. He hit at Battle with the rail, and the rail broke. Witness was 40 or 50 yards away, and did not know whether Smith struck Battle with the rail or not. Two fences were between him and the combatants. Just before Battle came, Smith called to witness and said something which he did not understand. After the combatants were separated Battle ran away like a flash. A half-brother of Smith testified, that after the cotton was carried to Hobbs's gin, Battle went back towards home, but returned, and witness said: "Joe, hold on; let me talk with you; don't have any fuss. The cotton belongs to Jordan for your rent. Pay him the rent and go back home; and if Jordan's ways don't suit you, leave him." Battle said he wanted to suit himself; that fifty cents was as much in his pocket as it was in Jordan's. He walked off saying, "Before two weeks Jordan will die." Witness never told Smith of this conversation. Battle agreed to carry the cotton to Hobbs's gin. At the gate he told Smith he was going to take his mule out of the wagon, and Smith said, "You shan't do that; before you shall have your mule I will kill you." The homicide occurred in Laurens county, and the sheriff had

a warrant for Battle for more than a year before he was arrested. He was found in Wilcox county. Walls testified, that about twenty minutes after Smith drove up with the wagon, Battle came within about ten feet of him, and Smith pulled off his coat and hat and laid them on the ground. He picked up a piece of rail five or six feet long, and made towards Battle, who ran backwards against the fence and motioned his hand at Smith. Smith struck him with the rail and knocked him against the fence. As he recovered Smith struck him over the head, and as he was straightening up Smith struck him again. At the third lick they ran together and fell. Smith had Battle down and was on top of him. That was the first time witness saw Battle using his knife. He never got hold of Smith until they ran together. Witness saw one lick pass after they were separated by Fullwood ; saw no attempt by Battle to use his knife until he was knocked with the stick; did not hear any words used. In striking Smith had hold of the rail with both hands. The second and third blows with it were across Battle's shoulders. The knife was in his hand when he was struck. There was testimony tending to impeach the main witnesses for the State, by proof of contradictory statements, etc. The grounds of the motion for a new trial are stated in the opinion.

*Robinson & Sanders*, for plaintiff in error. *H. G. Lewis*, solicitor-general, by *Anderson, Felder & Davis*, contra.

LITTLE, J. 1. The defendant was convicted of voluntary manslaughter, and made a motion for a new trial. The first three grounds in the motion were what is known as the general grounds, that the verdict is contrary to the evidence; without evidence; against the evidence; and is contrary to law and the principles of justice. It is not our purpose to detail the evidence in the case. The statement prefixed to this opinion contains in brief a synopsis of the evidence which was had on the trial. From it can not be gathered facts showing that the plaintiff in error was justifiable in taking the life of the deceased. When the final rencounter took place, the evidence shows that the accused was very willing to take part in the fight. After

he went out of the gate, according to one witness, he voluntarily returned with a drawn knife. It is true that the evidence shows that the deceased picked up a piece of rail and struck at or struck the accused; but it is evident that both intended to fight and were armed, the accused with his knife, and the deceased with a piece of fence-rail. The jury evidently believed this theory of the case when they returned a verdict for voluntary manslaughter; and we can not say that their finding was wrong, nor that the verdict is contrary to the law or evidence.

2. The next ground of complaint as set out in the motion for a new trial is, that the court erred in failing to plainly and explicitly define what a reasonable doubt on the mind of the jury was, upon which they should acquit the defendant, in connection with that part of his charge relating to there being no necessity on the part of the State to demonstrate with mathematical certainty the guilt of the accused. The charge which the court delivered on this point is in the following language: "On arraignment the defendant pleads not guilty, and that is the issue you are impaneled to try. Notwithstanding the indictment, the defendant enters into this trial with the presumption of innocence in his favor, and that presumption rests with him throughout the trial until the State by satisfactory evidence overcomes that presumption and establishes his guilt upon each material allegation contained in the indictment, and beyond all reasonable doubt. The State is not required to demonstrate with mathematical accuracy and precision the guilt of the accused, but the State is bound to satisfy you to a reasonable and moral certainty of his guilt." The point of exception is that the judge failed in this connection to explain the meaning of "reasonable doubt." It hardly seems to be necessary to add to the words "reasonable doubt" any other words explanatory of their meaning. Mr. Bishop, in the first volume of his New Criminal Procedure, says: "There are no words plainer than 'reasonable doubt,' and none so exact to the idea meant. Hence some judges, it would seem, wisely decline attempting to interpret them to the jury." See also 62 Me. 129; 9 Bush, 593; 7 Baxter, 35; 20 Texas Appeals, 315. In the words of another author, on the subject of giving a specific meaning to the word "reasonable"

when applied to reasonable doubts, "it is trying to count what is not number, and to measure what is not space." *Bone* v. *State,* 102 *Ga.* 392.   In the case of Miles *v.* United States, 103 U. S. 312, Justice Woods, delivering the opinion of the court, says on this subject: "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury."   He cites a number of cases in connection with this view.   It would seem, therefore, to be a conclusion that the phrase "reasonable doubt" explains itself.   Certainly the meaning is obvious, and will be readily appreciated by the average juror without further explanation.   In this case the expression when used by the judge could not have been misunderstood; and we find no error in his failure to enter into any detailed explanation of what was meant by the phrase "reasonable doubt."   The jury were told that the prisoner was presumed to be innocent, and that presumption continued until the State by satisfactory evidence overcame that presumption and established his guilt upon each material allegation contained in the indictment, and beyond all reasonable doubt. We do not imagine that the jury failed to understand from the charge the law on this branch of the case.

3. The next assignment of error is, that the court erred in charging the jury, from section 73 of the Penal Code, that "If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary"; without adding further to that portion of the charge, the words, "or that the party killing believed in good faith it was necessary."   Speaking for myself, I do not understand that the words sought to be added to this section of the code is a good statement of the law.   On the contrary, my own view is, that section 73 refers to the class of cases where the accused is only justifiable when, in order to save his own life, the killing of the deceased was *absolutely* necessary; and that the doctrine of reasonable fears, as contained in section 71 of the Penal Code, refers to those cases of justifiable homicide set out in section 70 of the Penal Code. It is not necessary, however, that we should make a ruling

upon this point, as, by reference to the charge of the judge, the provisions of the criminal law in reference to reasonable fears were given immediately preceding that portion of the charge which is complained of, and it is apparent from a consideration of the charge as a whole that the jury were properly instructed in reference to the doctrine of reasonable fears sufficient to justify a homicide.

4. The last assignment is, that the court erred in refusing to charge the jury in the following words of a written request: "If the jury should believe from the evidence that the defendant hit the deceased the fatal blow in defense of his person, to prevent a serious personal injury, the defendant would be justified in killing the deceased; or that defendant killed deceased to prevent a felony being committed upon his property by deceased, then the killing would be justifiable; or if the killing was done to prevent the deceased from committing a trespass upon his property, the killing would not be murder, but would only be manslaughter." We can not think that any proposition contained in this written request to charge should have been given in charge to the jury. So far as the first is concerned, it is not the law. The language of our code justifies a homicide to prevent the commission of a *felony* upon the person of the slayer. An act of violence committed on the person of another, which is included within the class of offenses which the law declares to be felonies, will always include a serious personal injury; but an act of violence so committed, although it amounts to a "serious personal injury," does not necessarily come within the class of crimes known as felonies. If, under our code, the injury about to be inflicted was less than a felony, it would not be sufficient cause to justify the taking of life in self-defense. This justification is complete only (when the life of the assailant is taken) where the deceased, manifestly intended or endeavored by violence or surprise to commit a felony on the person of the accused. In the case of *Simmons* v. *State*, 79 *Ga.* 700, Simmons, J., in delivering the opinion of the court, says: "The code, in defining the act of self-defense, does not justify the killing of another by one who believes or has grounds to fear that he will be injured; cer-

tainly no one will contend that it is justifiable to take life to prevent a small injury, an assault and battery, or something of that sort; but the only justification upon the ground of self-defense laid down by our code is, where one 'manifestly intends or endeavors, by violence or surprise, to commit a felony on person, property or habitation.'' In the case of *Johnson* v. *State*, 72 *Ga.* 679, this court said, speaking through Chief Justice Jackson, on this subject: "The verdict should be justifiable homicide, if the facts and circumstances surrounding the accused were such as to excite the fears of a reasonable man that a joint felonious assault was being made upon him; it should be voluntary manslaughter, if they were such only as to excite the fears of a reasonable man that some bodily harm less than a felony was imminent and impending; it should be murder, if the circumstances were not such as to excite the fears of a reasonable man that he was in any serious danger at all." So also the court in the case of *Keener* v. *State*, 18 *Ga.* 194, held, that if a person is under fears of some injury less than a felony, the offense is manslaughter. Our code, and these decisions of our own court, we think were sufficient to justify the presiding judge in his refusal to give this part of the request in charge to the jury.

The second proposition in the request to charge should not have been given, because it was not warranted by the evidence in the case. The evidence shows that, at the time the wound from which the deceased died was inflicted, the parties were engaged in a rencounter, and there was no attempt at that time by the deceased to commit a felony upon the property of the accused.

The third and last proposition should not have been given, under the facts of this case. The plaintiff in error was not injured by the refusal of the judge to give it. The verdict in this case is voluntary manslaughter; and therefore there is no just ground of complaint that the court refused to give a proposition of law in charge which would reduce the offense from murder to manslaughter, even if it was not, as we think here it was, covered in the general charge. Aside from these considerations, the charge requested was not, as a

whole, adjusted to the law and the facts of the case; and for this reason the court would have been authorized to refuse to charge any portion of the request.

The jury passed upon this case, we have no doubt, in a careful and discriminating manner; the evidence in the record supports their finding, and we will not set it aside. The judgment of the court below overruling the motion for a new trial is                          *Affirmed.    All the Justices concurring.*